# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DANIEL C. BURTON,

        Plaintiff,

        v.                                Case No. 05-C-367

KIRSTEN RUZICKI, SCOTT EGGERS,
DEBBIE MADDERN, and UNKNOWN,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Daniel C. Burton, who is currently incarcerated at the Kankakee Detention Center, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis*. The plaintiff is preceding on claims that, while incarcerated at the Kenosha County Detention Center, the defendants used excessive force, subjected him to intolerable conditions of confinement, and displayed deliberate indifference to his serious medical need in violation of the Fourteenth Amendment. The defendants have filed a motion for summary judgment and the plaintiff has filed a motion to amend the complaint. Both of these motions will be addressed herein.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General

Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the

2

existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

### 1. Background

Kristen Ruzicki, Scott Eggers, Debra Maddern, Robert Pallamolla, and James Post have been correctional officers at Kenosha County Detention Center ("KCDC") at all material times. (Aff. Ruzicki ¶ 2; Aff. Eggers ¶ 2; Aff. Maddern ¶ 2; Aff. Pallamolla ¶ 2; Aff. Post ¶ 2.) Captain Gary Preston has been employed with the Kenosha County Sheriff's Department since 1979, having served as the captain of KCDC since January 2005. (Aff. Preston ¶ 2.) Sergeant Hunter Johnson has been a correctional sergeant and detentions shift commander for the Kenosha Sheriff's Department since August of 2001, and he had previously been a corporal for four years. (Aff. Johnson ¶ 2.)

Correctional Officers Ruzicki, Eggers and Maddern received initial academy training at Gateway Technical College known as the "Wisconsin Department of Justice Jailor Basic Academy." (Aff. Ruzicki ¶ 2; Aff. Eggers ¶ 2; Aff. Maddern ¶ 2.) Every correctional officer takes this three-week course, which includes instruction pursuant to the Principals of Subject Control (Correctional

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact and from the Plaintiff's Response to the Defendants' Proposed Findings of Fact.

3

Personnel) P.O.S.C. Basic Certification Program Training Manual. *Id.* Since 1999 and 2003, Officer Maddern and Officer Ruzicki, respectively, have been field training officers in addition to correctional officers. (Aff. Ruzicki ¶ 2; Aff. Maddern ¶ 2.) Training for this position included a four-day class at Gateway Technical College, taught by Tom Hausner, who is certified to train officers in all areas of Field training, including the use of force. *Id.* Correctional Officers Ruzicki, Eggers and Maddern also receive in-service training every year for a total of twenty-four hours on use of force. (Aff. Ruzicki ¶ 2; Aff. Eggers ¶ 2; Aff. Maddern ¶ 2.) They also take a continuing learning course in correctional training at Gateway Technical College every year; it is a three-day course with one of those days focusing on the use of force. *Id.* The training concludes with testing in the subject matter covered during the same course, and they have passed all examinations. *Id.*

The KCDC houses approximately 650 inmates on a daily basis. (Aff. Hunter ¶ 3.) The KCDC has two facilities: one near the Kenosha County Airport and one located at 1000 55th Street in Kenosha. About 290 of those inmates would be at the 1000 55th Street facility, the location of the incident giving rise to this case. *Id.* The plaintiff came to the KCDC from the United States Marshal's Office as a pretrial detainee. At the time of his booking on October 15, 2004, the plaintiff informed the jail that he had been incarcerated for the past thirteen to fourteen years. (Burton Dep. at p. 11; Aff. Preston ¶ 4.) Most of his prior incarcerations were at maximum security institutions. (Burton Dep. at p. 25.) The plaintiff has had at least ten arrests since June 1987. (Burton Dep. at p. 132-136; Aff. Preston ¶ 4.) The plaintiff had been considered a high security inmate. (Burton Dep. at p. 18; Aff. Preston ¶ 5.) As a United States Marshal detainee, Kenosha County correctional officers were aware that he presented an escape and assault risk. (Aff. Johnson ¶ 5; Aff. Preston ¶ 4; Aff. Pallamolla ¶ 8; Aff. Ruzicki ¶ 7; Aff. Maddern ¶ 4.)

4

Inmates are classified Level I through Level VIII, with Level I being maximum security and Level II, which was the plaintiff's classification, being the institutional classification for all initial pretrial detainees received from the United States Marshal Service. The Marshal Service and the Kenosha Sheriff's Department have an informal agreement that the KCDC will hold United States Marshal pretrial detainees as Level II inmates because these inmates have potential escape risks and assault histories. (Aff. Preston ¶ 4.)

In his last thirteen to fifteen years of incarceration, the plaintiff has had incident and insubordination reports filed against him. (Burton Dep. at p. 94.) In fact, at the KCDC, on November 7, 2004 – the month before the incident in this matter – the plaintiff disobeyed an officer's orders to close his cell door, refused to return to his cell, and caused a disruption which led to inmates screaming and yelling. (*Id.* at p. 95-96.) At his disciplinary hearing the following day, he told the hearing officer to stop talking while the officer was going through the allegations. (*Id.* at p. 97; *see also* Ex. 10.)

The plaintiff is about 5'6" or 5'7" tall, and he weighed approximately 195 pounds. (Burton Dep. at p. 75.) All the officers involved in the incident in this case weighed less than he, and Officers Eggers and Maddern were shorter than he. (Aff. Post. ¶ 2; Aff. Pallamolla ¶ 2; Aff. Eggers ¶ 2; Aff. Ruzicki ¶ 2; Aff. Maddern ¶ 2.)

The Kenosha County Sheriff's Department Detention's Division Pre-Trial Facility Inmate Rules, Regulations and Information Packet ("KCDC Inmate Rules") contains inmate rules, regulations and information which the plaintiff would have received upon being booked at the KCDC. (Aff. Preston ¶ 3.) Therein, inmates are told they will be expected to be aware of and to follow the jail rules. "Rules have been adopted for the purpose of maintaining proper custody

5

Case 2:05-cv-00367-WEC   Filed 03/08/07   Page 5 of 27   Document 72

control, and to ensure the safety of the inmate population." (Ex. 5 p. 1.) Among other rules, inmates are told that "[t]here will be no loud talking" during meals. (*Id.* § 13 p. 16; *see also id.* §3 p. 2.) It is also against KCDC Inmate Rules to "act in a loud… manner." (*Id.* § 3 Rule 19.) Further, inmates receive one catch-all rule: "follow the direction of your Zone Officer at all times." (*Id.* § 3 p. 2).

## 2. Incident on December 2, 2004

On the morning of December 2, 2004, defendant Officer Ruzicki entered Cell Block B's dayroom to serve the inmates breakfast. As described by Captain Preston and illustrated by various photographs and diagrams, Cell Block B has a small dayroom surrounded by six cells on one side of the dayroom and the control room on the other side of the dayroom. One enters Cell Block B through the hallway prison door and then through the "sally port" which leads into the dayroom. (Aff. Preston ¶ 5; Ex. 6-7.)

Upon entering, Officer Ruzicki heard the plaintiff shouting profanity. (Burton Dep. p. 21; Hicks Dep. p. 4.) At the time, the plaintiff and another inmate were engaged in a conversation, but the plaintiff had been doing "most of the talking because I was upset about being locked up." (Burton Dep. at p. 21-22.) He was complaining: "the system is fucked up, all they do is screw you, you sit in these places, mad, you can't do this, you get up at crazy hours, you go to sleep at crazy hours, it's all screwed up, it's all fucked up." (*Id.* at p. 22.) The plaintiff was aware that the jail "got a rule that profanity would not be tolerated or something like this in the handbook." In his vocabulary strong language such as "fuck this, fuck that" is not profanity – "it's just strong language." (*Id.* at p. 23-24.) The plaintiff agreed that most institutions have a rule regarding profanity like the Kenosha Sheriff's Departments. (*Id.* at p. 25.) He agreed that it is a "common rule." (*Id.*)

6

Officer Ruzicki instructed the plaintiff that she did not want to hear "that kind of language first thing in the morning," and the plaintiff responded by instructing her to serve the food. (Ex. 1; Ex. 13 at p. 6; Burton Dep. at p. 26.) Officer Ruzicki then served the plaintiff his tray of food and told him to go in his cell for lockdown. *Id.* The plaintiff took his meal, sat down at the table in the dayroom and refused to go to his cell. (Ex. 1; Ex. 13 at p. 6-7.) The plaintiff testified:

> I said, okay, I'm on lockdown, but I'm eating my food at the table and I went and I took --- she gave me my food and I went and sat at the far end of the picnic table out there and started eating... And when she basically got through handing out the last few of the meals she looks up at me and she says, I told you to go to your cell and eat. I said, I ain't going to eat in there. I'm gonna finish my meal and then I'll go lockdown.

(Burton Dep. at p. 29.) The plaintiff understood what Officer Ruzicki meant by "lockdown," and he admitted that he could have complied with Officer Ruzicki's orders at that point. (*Id.* at p. 29-30, 31.) "I know I got to follow the order, but I ain't got to follow it at that moment." (*Id.* at p. 33.)

The plaintiff had refused Officer Ruzicki's orders twice: to stop using profanity and to eat his meal in his cell. Still, upon being ordered a third time to go into his cell, he continued to ignore her order, stating that he would not follow her order until he was finished eating. (Burton Dep. at p. 38-39; Hicks Dep. at p. 6-7; Ex. 1.) For her fourth attempt, Officer Ruzicki threatened to lock down the remaining inmates and call for back-up to assist in his removal, but the plaintiff continued to eat his breakfast and ignored her instructions. (Burton Dep. at p. 40; Ex. 1.) At each instance, Officer Ruzicki maintained her distance from the plaintiff. (Burton Dep. at p. 38.)

Officer Ruzicki ordered the remaining inmates to lock down in their cells and she called for backup over her radio, advising the plaintiff that he was going to the "hole." (Burton Dep. at p. 34-35, 39; Ex. 1 at p. 7-8.) The "hole" is a discipline room in the segregation unit. (Burton

7

Dep. at p. 46.) The plaintiff continued to eat his breakfast at the dayroom table, watching inmates in his own block go into lock-down. (Burton Dep. at p. 34-35.) At this point, the plaintiff understood Officer Ruzicki's orders: "It's a regular order, all the time. … That type of order is not unusual to me." (*Id.* at p. 39.)

Defendants Correctional Officers Eggers and Maddern responded to the call for assistance and were immediately briefed by Officer Ruzicki about the situation. (Ex. 2-3.) The three jail officers entered the B Block dayroom together. (Burton Dep. at p. 43-45.) The plaintiff recalled this moment: "When [Officer Eggers entered the dayroom and] came around the table, I truly think he had handcuffs in his hand. Right. And he said --- he walked right up on me. I'm looking up at him and he says, get up, you're going to the hole. And I say, fine, as soon as I'm done eating." (*Id.* at p. 46.)

Officer Ruzicki took a position behind the plaintiff (thus placing herself between the dayroom table and the cinder-block wall), Officer Eggers stood directly across from the plaintiff on the opposite side of the dayroom table, and Officer Maddern stood several feet to Officer Egger's right side. (*See* Ex. 17; Burton Dep. at p. 40-45.) After the plaintiff responded to Officer Eggers order that he would comply "when I'm done eating," the plaintiff testified that he next told Officer Eggers again that he would comply "as soon as I'm done." (Burton Dep. at p. 48.) The plaintiff understood Officer Eggers' orders. (*Id.* at p. 46-47.) The plaintiff admittedly disobeyed, believing that he could finish eating while three officers stood in the room. (*Id.* at p. 47.) At this juncture, he understood that he could have stopped eating in order to comply with the orders or the directives of the officers, or otherwise obeyed the jail officers' commands in a timely fashion. (*Id.* at p. 73, 134-135; Ex. 10.)

As the plaintiff continued to eat, Officer Ruzicki reached in and "blanketed" the plaintiff's

8

arm.[2] (Ex. 1; Ex. 13 at p. 8.)  The plaintiff stood up abruptly, "snatching" his arm away from Officer Ruzicki and leaning away from her when she reached for his arm.  (Burton Dep. at p. 49, 58.)  The plaintiff admits causing himself to become free of a correctional officer's escort hold.[3]  (Burton Dep. at p. 49, 58.)  Officer Eggers then moved towards the plaintiff in an attempt to gain control over him.  (Ex. 2.)  Officer Eggers managed to wrap his arms around the plaintiff's shoulders, but the plaintiff stood up from the table.  (Burton Dep. at p. 52-53.)  The plaintiff's arms were under Officer Eggers' armpits and were extended behind Officer Eggers. (*Id.* at p. 54.)  One inmate witness described the plaintiff as having his arms around Officer Eggers in a "football-style" position.  (Hicks Dep. at p. 11-21.)  At that point, the momentum of both men caused them to fall towards the floor.  (Burton Dep. at p. 52.)  The plaintiff's face was "in [Officer Ruzicki's] shoulder."  (*Id.* at p. 55.)  As the two men were falling towards the bars, the plaintiff reached "out up under him to try to stop my fall" by grabbing onto the cell bars.  (*Id.* at p. 54-55.)  The plaintiff recalled Officer Eggers' head hitting the cell bars: "[Officer Eggers' head] had to. There was no way. It was between me and him and the bars."  (*Id.* at p. 56.)

Officer Eggers sustained bruising and an injury to the back of his head as a result of hitting the cell bars. (Burton Dep. at p. 74; Ex. 2.)  At this point, Officer Eggers and Burton were "off balance" and fell to the floor.  (Burton Dep. at p. 58.)  As Officer Eggers tried to disengage, the plaintiff tried to get up but Officer Eggers grabbed his head in an attempt to keep him on the ground.  (Burton Dep. at p. 65; Ex. 2.)  Officer Ruzicki then called for further back-up and warned the

_____

[2] The correctional technique of "blanketing" the arm is an escort hold by which an officer's two hands form a cup around the subject's elbows in order to escort the subject.  (Aff. Ruzicki ¶ 5; Aff. Preston ¶ 11; Aff. Johnson ¶ 8.)

[3] The plaintiff disputes this proposed fact.  He avers that he was never in an escort, but was grabbed for no reason.  (Burton Aff. at p. 3.)

9

plaintiff that she was going to use pepper spray (a/k/a "OC spray"). (Hicks Dep. at p. 13; Ex. 1-3.) The plaintiff heard Officer Eggers shout "spray him" and saw Officer Ruzicki "shake" the OC spray before discharging it at him. (Burton Dep. at p. 61.) Officer Ruzicki warned the plaintiff she would deploy the spray and did so in a one second burst after he failed to obey her warning to stop. (Ex. 1.) Having no effect on the plaintiff, largely because she missed and because the plaintiff had turned his head away and closed his eyes, Ruzicki again deployed the OC spray in a one-second burst. (Burton Dep. at p. 61, 63; Hicks Dep. at p. 13; Ex. 1.)

The three officers managed to direct the plaintiff to the floor in a controlled manner by bringing him down at his legs, forcing him on his stomach and holding his head down on the floor. (Burton Dep. at p. 65; Hicks Dep. at p. 13; Ex. 1-3.) Correctional Officers Post and Pallamolla arrived and hand-cuffed the plaintiff. Upon arrival in B-Block, Officers Post and Pallamolla heard inmates screaming and yelling, observed the officers struggling with the plaintiff on the ground, and heard the officers' shouts to "stop resisting." (Aff. Post. ¶ 4; Aff. Pallamolla ¶ 4.) It was very loud and very chaotic due to screaming inmates and the smell and sensation of OC spray in the air. (*Id.*) There was a choking sensation, almost like being in a fire in a house. (Aff. Pallamolla ¶ 4.) OC spray will not quickly dissipate in a small area like the B Block dayroom; a one-second burst of OC spray travels approximately thirty linear feet in a shotgun fashion, covering a large area. (Aff. Preston ¶ 11; Aff. Johnson ¶ 10.) Officers Post and Pallamolla handcuffed the plaintiff and then brought him up to his knees. (Aff. Post. ¶ 5; Aff. Pallamolla ¶ 4.) The plaintiff then got up and proceeded to walk with Officers Pallamolla and Post while they maintained a hold on him with one hand on his elbow

10

and one hand under his armpit/upper arm.[4]  (*Id.*)  As they got halfway between the table and the doorway, the plaintiff's body collapsed, but the officers did not let him hit the ground.  (*Id.*)

At that point, the plaintiff had become "limp weight" and nonresponsive – in a situation that was as near to a riot situation as a correctional officer can experience. (Aff. Post. ¶ 6; Aff. Pallamolla ¶ 5.)  Under such chaotic circumstances – inmates screaming, the smell of OC spray, the plaintiff's "limp weight" and size, holding the plaintiff in such a way so that he would not drop, and the small size of the sally port doorway (three feet wide) – attempting to exit B Block quickly became very difficult.  (*Id.*)  The correctional officers could not simply relinquish control over the plaintiff by dropping him as they exited because such action could cause severe injuries to an inmate.  (Aff. Post. ¶ 7; Aff. Pallamolla ¶ 6; Aff. Johnson ¶ 9; Aff. Preston ¶ 14.)  Nor could they keep the plaintiff in the B Block and allow nurses and other officers to enter B Block to provide medical attention and other assistance given the chaos of inmates screaming, the presence of OC spray in the air, and the need to maintain institutional safety and security, including clearing out the dayroom due to its small size and close proximity to inmates who could throw objects or other substances, including bodily fluids, on jail staff working in that area.  (*Id.*)  Had the plaintiff received medical attention inside the B Block dayroom, jail officers and nurses would have had to bend down with their back towards the inmates, which would be a very unsafe and dangerous situation if the inmates started throwing objects at the staff. (*Id.*) Therefore, any medical assessment had to take place outside of B Block. (*Id.*)

_____

[4] The plaintiff disputes this proposed fact.  He avers that he never walked or got up off the floor, once down.

**3. Post-Altercation Medical Attention and Care**

Sgt. Johnson arrived at the scene about one to one and one-half minutes after he received the call about a disruption in B Block. (Aff. Johnson ¶ 4.) Upon arrival, Officers Post and Pallamolla were coming out of the B Block cell door each carrying the plaintiff in their arms. (*Id.*) The plaintiff's head appeared limp and his feet were dragging behind him on the floor. (*Id.*) The officers were holding the plaintiff in such a manner to make sure he did not fall on his face or fall on any officer. *Id.* Sgt. Johnson ordered the officers to remove the plaintiff's handcuffs and lay him on the floor in the hallway in a full recovery position and place a towel under his head.[5] (*Id.* at ¶ 5; Aff. Post ¶ 8.) Sgt. Johnson checked the plaintiff's vital signs, ordered the officers to retrieve wet towels to tend to the OC Spray, and then ordered the injured correctional officers to seek medical attention. (Aff. Johnson ¶ 5; Aff. Post. ¶ 8; Aff. Pallamolla ¶ 7.) Nurses arrived about one to one and one-half minutes after Sgt. Johnson's arrival and made an initial assessment of the plaintiff. (Aff. Johnson ¶ 5.) While the nurse was in the process of tending to the plaintiff and assessing his medical needs, Sgt. Johnson decided to have 911 called in to take the plaintiff to the Kenosha County Hospital to expedite the level of care he could receive. (*Id.*)

At the hospital, the plaintiff received immediate medical attention and x-rays for his shoulder complaints, facial abrasions and a left orbital contusion. (Ex. 14 (0009-0017).) The medical reports indicate the plaintiff sustained a dislocated right shoulder, and following relocation the plaintiff had normal alignment and full range of motion. (*Id.*) For the pain, he received medication on a regular

---

[5] A full recovery position means that an inmate is placed on the ground with his knees bent at a 45° angle at his side. *Id.*

Case 2:05-cv-00367-WEC   Filed 03/08/07   Page 12 of 27   Document 72

basis, an immobilizer and physical therapy.[6] (*Id.*; Ex. 15 (0008).) For the left orbital contusion, an eye ointment called gentamycin had been prescribed with discharge instructions: "Gentamycin to both lower lids 4 times a day." (Ex. 16 (0012); Ex. 14 (0005).)

Over the next several weeks, the plaintiff received orthopedic consultations, physical therapy, and daily nursing visits. (Ex. 16 (0006, 0041-0042); Ex. 15 (0007-0008).) By January 25, 2005, the plaintiff denied any "problems" and was found to be "stable." (Ex. 16 (0010).)

## 4. Use of Force Policy and P.O.S.C. Training

None of the officers in this case has ever been charged with, disciplined for, or subject to claims of excessive use of force. (Aff. Preston ¶ 6; Aff. Ruzicki ¶ 7; Aff. Maddern ¶ 4; Aff. Eggers ¶ 4; Aff. Post ¶ 9; Aff. Pallamolla ¶ 8.) All jail officers, including Officers Ruzicki, Maddern, and Eggers, receive principles of subject control ("POSC") training, which includes training in the amount of force used by officers as dictated by the level of resistance of the inmate. (Aff. Ruzicki ¶ 1; Aff. Maddern ¶ 1; Aff. Eggers ¶ 1; Aff. Preston ¶ 6.) Such training follows the Department of Justice/Law Enforcement Standards Board Defensive and Arrest Tactics Technical Advisory Committee's recognized continuum of force. (*Id.*)

The force option continuum contains five stages: (1) presence, (2) dialogue, (3) empty hand control, (4) intermediate weapon, and (5) deadly force. Essentially, in P.O.S.C. training, principles of subject control range from a system of verbalization skills to physical alternatives. The ultimate purpose of defensive tactics training is control. Control is not a 50/50 proposition; the officer must maintain the position of advantage at all times. An officer is always permitted to disengage and/or

---

[6] The plaintiff avers that he did not receive the hospital-prescribed pain killers until five days after his injuries. (Ex. 16 (0012); Burton Aff. at p. 10.)

13

escalate in order to take proper law enforcement action. (Aff. Preston ¶ 7; Aff. Johnson ¶ 6.) The phase of the control process particularly relevant here involves "approach considerations" and "intervention options." The "approach considerations" involve the initial justification and desirability to approach the subject. Officers are trained to understand proxemics between normal social distances and institutional distances. They are also trained how to best position themselves relative to the subject and to provide cover for one another in high-risk or close quarter situations. When correctional officers approach a subject, they are further trained to remain alert, be decisive and have a pre-planned, practiced response in mind. Tactical evaluation considerations include threat assessment opportunities evidenced by the subject's level of agitation, conspicuously ignoring an officer, behavioral history, and other "early warning signs" that predict possible assault or disruptive behavior. The purpose of the threat assessment opportunities is to predict that a subject is going to become assaultive and prepare the officer to protect him/herself against this possible assault. When considered along with subject behavioral factors and other special circumstances, the purpose of threat assessment further assists the officer in justifying his or her response to the subject. (Aff. Preston ¶ 8; Aff. Johnson ¶ 6.)

The "intervention option" ranges from officer presence followed by dialogue/verbal persuasion and then followed by "empty hand control techniques." Presence attempts to create as positive an environment as possible. Correctional officers are instructed to ask, set the context, present options to the subject and confirm non-compliance before taking action by either disengaging and/or escalating. The purpose of dialogue is to attempt to establish compliance with verbal skills that involve normal conversational tone, persuasion by soft tones, light control talk by insistent tones, and heavy control talk by issuing ultimatums. (Aff. Preston ¶ 9; Aff. Johnson ¶ 6.)

14

The next phase of "intervention options" includes "empty hand control techniques." "Empty hand control techniques" subdivide into four techniques, escalating based upon reasonable perception of danger: escort holds, compliance holds, passive countermeasures, and active countermeasures. Escort holds seek to safely initiate physical contact with a subject; an escort hold involves "blanketing" the arm by gently laying the officer's hands at the subject's elbow or escorting positions by police escort positions. Compliance holds seek to overcome passive resistance by the use of wrist locks and compression and compliance holds; the amount of force an officer uses on the wrist differentiates compression and compliance holds. Passive countermeasures decentralize the subject and direct the subject to the ground. Training involves instruction in efficient decentralization concepts as well as proper techniques to secure the subject's head, grappling with the subject and controlling the speed of descent. (Aff. Preston ¶ 10; Aff. Johnson ¶ 6.) Active countermeasures, the final "empty hand control technique," involve high level control tactics designed to provide a necessary link between violent resistance and control. Active countermeasures include blocks, vertical stunning techniques such as directing a violently resisting subject to a wall or other vertical surface, focus strikes, diffused strikes, and OC spray. Focused strikes involve hand strikes, leg strikes and combination of hand and leg strikes. If a technique does not work, an officer may disengage and/or escalate the situation by multiple strikes or the use of OC spray. The purpose of OC spray is to gain control and compliance of a subject who is exhibiting active resistance or is a threat. OC spray is designed to temporarily disrupt the subject's ability to see and breathe effectively. The techniques involved in the use of OC spray include: verbal warnings, hand on the weapon, drawing the weapon, loading the weapon, and then using the weapon. Once a subject has been

15

stabilized after the use of OC spray, officers are instructed to commence after-care procedures. (Aff. Preston ¶ 11; Aff. Johnson ¶ 6.)

The Jail's Use of Force Policy is No. 451. This policy's purpose, procedure, and continuum of force comports with the aforementioned standards. (Aff. Preston ¶ 12; Aff. Johnson ¶ 6.)

Any injuries the plaintiff sustained would not have been caused purposefully or sadistically but in a good faith effort to restore institutional security during a potentially explosive situation.[7] (Aff. Ruzicki ¶ 7; Aff. Maddern ¶ 4; Aff. Eggers ¶ 4; Aff. Post ¶ 9; Aff. Pallamolla ¶ 8.) At no time during the correctional officers' interaction with the plaintiff did they act to intentionally harm or punish him. (Aff. Ruzicki ¶ 7; Aff. Maddern ¶ 4; Aff. Eggers ¶ 4; Aff. Post ¶ 9; Aff. Pallamolla ¶ 8.) They used only the force necessary to restrain a recalcitrant high security inmate who had a known correctional history involving behavioral disturbances, to restore order in the B-Block, and to escort him out of B-Block.[8] (Aff. Ruzicki ¶ 7; Aff. Maddern ¶ 4; Aff. Pallamolla ¶ 8.)

After examining the correctional officers' reports and the deposition testimony of the plaintiff, and based on the above policy and principles of subject control and the use-of-force continuum as well as based upon my training, education, and experience as a law enforcement officer, it is the opinions of Captain Preston and Sgt. Johnson that the correctional officers exercised their use-of-force discretion reasonably and justifiably under the circumstances in order to restore institutional security during a potentially explosive situation. (Aff. Preston ¶ 13; Aff. Johnson ¶ 8.)

---

[7] The plaintiff disputes this proposed finding of fact. He states that the injuries he suffered were inflicted on purpose and in bad faith. (Burton Aff. at p. 4-5.)

[8] The plaintiff disputes this proposed fact. He states that the officers' interaction with him was done to intentionally harm him. (Burton Aff. at p. 4-5.)

16

**5. Disciplinary Hearing and Grievances**

The plaintiff was charged with 3 Category IV violations: (1) Rule 403A, which prohibits "[c]omitting any act which requires staff to use force against an inmate."; (2) Rule 406A, which prohibits "[u]se of Force against staff or service providers."; and (3) Rule 412A, which prohibits conduct in "[v]iolation of any State Statute or County Ordinance." (Ex. 10 at p. 13-14.) On December 7, 2004, the KCDC conducted a disciplinary hearing. At the hearing, the plaintiff stated that an officer grabbed his arm while he was sitting and eating. (Ex. 10.) He then stated that another officer attacked him, but admitted that the incident occurred "probably because he did not do what they wanted fast enough." (*Id.*) When asked if he ran an officer into the cell bars, he had no comment.[9] (*Id.*)

The hearing officer sustained violations of jail rules 403, 406 and 412. (*Id.*) The plaintiff received ten days disciplinary segregation imposed for each charge to be served consecutively for a total of thirty days. (*Id.*) The hearing report form stated that the plaintiff "may appeal the results of this hearing to the facility administrator or his designee within ten days of this hearing. You must complete an inmate request form and address it to the hearing officer. You will then be forwarded for review." (Ex. 10.)

On December 18, 2004, the plaintiff submitted an inmate grievance seeking explanation for his segregation status. (Ex. 10.) On December 21, 2004, Lt. Mark Schlecht, facility administrator, responded to the plaintiff's appeal of his discipline hearing. (Ex. 10.) After reviewing all of the information, Lt. Schlect affirmed disciplinary confinement: "These are serious violations of policy,

_____

[9] According to the plaintiff, his alleged statement was made under pain, stress, and suffering, without a staff representative and not having any rights read to him. (Burton's Affidavit of Prior Punishment at p. 2.)

17

records indicate that your scheduled release date is January 1, 2005. Continued appropriate behavior on your part will result in an upgrade of your conditions of confinement. I recommend that you remain violation free. I see no evidence to overturn this disciplinary action, therefore your appeal is denied." (*Id.*)

The KCDC has a specific procedure for inmates to follow if they have requests for medical attention or have a complaint about prison conditions. The KCDC Inmate Rules provide as follows:

Request for Medical Attention Form – Medical staff are available 24 hours per day with on-site Doctor's care available once per week. Inmates seeking medical attention must submit a request on the proper form prior to 10:00 PM the night before, unless emergency circumstance exists.…

Inmate Request/Grievance Form – The inmate Request/Grievance Form is a general-purpose document used to request a variety of services and programs. The form can be used to submit a complaint, concern, or convey information to a staff member. The request/grievance must be legible, on the proper form, signed, dated, and submitted without profanity.…

Complaints: During your confinement you may feel you have a basis for a complaint. When this is the case, whenever possible, you are encouraged to resolve the complaint informally with a Correctional Officer or applicable staff member. When an informal resolution is not possible, written complaints and decision appeals are to be submitted in writing to the shift supervisor. All complaints properly submitted will be reviewed by the applicable staff member. The legitimacy of each complaint will be determined and a response/resolution will be provided. Keep in mind that the complaint procedure is a vehicle for you to seek resolution for legitimate factual concerns.

(Ex. 5 at p. 6-7.)

The plaintiff did not submit any complaints or grievances about cell temperatures or medical care (i.e., failure to provide eye ointment).[10] (Aff. Preston ¶ 19.) The process explained in the

---

[10] The plaintiff avers that he did not and could not submit any complaints or grievances during his time in Cell HW-49 because he was not allowed any writing materials and his injuries would not allow him to do so. (Burton Aff. at p. 8.)

KCDC Inmate Rules handbook outlines the process for submitting complaints and grievances. (*Id.*) First, the inmate makes an informal request to try to handle the matter with the CO guarding the inmate. (*Id.*) If the matter is not resolved, the inmate may file a written grievance, sent to the shift supervisor. (*Id.*) As with all forms, this form is available upon request by an inmate. (*Id.*) Therein, inmates should address the issue, specifying the date, time, and location of the incident and suggesting a solution to the problem. (*Id.*) If not resolved by the shift supervisor to the inmate's satisfaction, the inmate may appeal the shift supervisor's decision within 72 hours to the Assistant Facility Administrator, whose decision is final. (*Id.*) Between December and January, the plaintiff completed at least six Inmate Request Forms and submitted his appeal of his disciplinary charges relating to the December 2nd incident. (Ex. 11.)

### 6. Conditions of Confinement

When the plaintiff came back from the Kenosha County Hospital, Sgt. Johnson ordered him to be transported to KCDC segregation at the facility near the Kenosha County Airport. (Aff. Johnson ¶ 7.) The plaintiff acknowledged he is not making any type of claim that the ventilation system is inadequate. (Burton Dep. at p. 114.) The plaintiff does not know whether any of the officers tried to turn up the temperature. (Burton Dep. at p. 114. ) The plaintiff had several occasions to leave HW-49 during his several day stay: he went to court twice, had one doctor visit, and had one orthopedic visit. (*Id.* at p. 109-11.)

The facility housing H-Block has been in operation since 1998. (Aff. Preston ¶ 15.) No other inmate has filed any grievances or lawsuits relating to the cells being too cold in the winter months. (*Id.*) If an inmate has complained in the past that his cell was too cold, Captain Preston instructs officers to check the cell's temperature with thermometers. (*Id.*) Inmate's clothing consists of the

following: one uniform pant, one uniform top, one sweatshirt, one pair of socks, underwear and a T-shirt. (*Id.*; Burton Dep. at p. 118-120.) Inmate bedding consists of three blankets, two sheets, a towel, and an extra blanket in winter.[11] (*Id.*)

The KCDC building is climate controlled and thus ambient temperatures are maintained throughout the facility; the average temperatures inside ranges between 71 and 80 degrees in the summer and 69 and 76 degrees in the winter months. (Aff. Preston ¶ 17.) Maintenance also periodically checks the heating and cooling equipment and will re-route blowers as necessary. (*Id.*) In any event, the plexiglass does not effectively stop ventilated air from entering the individual cell. The jail installed plexiglass shortly after it opened in 1998 in order to prohibit inmates from throwing objects or other substances, including bodily fluids, on jail staff working in that area. (Aff. Preston ¶ 16.)

### 7. Inadequate Medical Care Claim

The plaintiff recalls Officers Hicks, Danpere, and Van Dam complying with his request to put ointment in his eye. (Burton Dep. at p. 125.) "Those three officers, whenever I called and they was working, bam, they did it immediately." (*Id.*) He recalls that Officers Hicks and Danpere would put the ointment in his eye during the morning and afternoon time frames. (*Id.*) He mostly did not get his ointment late at night. (*Id.*)

In a medical emergency, correctional officers will provide care, such as CPR, as an emergency first responder only. (Aff. Preston ¶ 18; Aff. Johnson ¶ 11. ) Generally speaking, jail officers are not trained to provide medical care other than as first responders. (*Id.*) All other medical

---

[11] The plaintiff avers that he had no shoes on his feet from December 2, 2004 until December 8, 2004, in cell HW-49. (Burton Aff. at p. 10.)

care, including dispensing medication, is performed by certified registered nurses and licensed practical nurses. (*Id.*) The jail nurses are on staff twenty-four hours a day. (*Id.*)

Jail records show that the plaintiff received the eye medication on December 2, 4, 5, and 7, 2004.[12] (Ex. 19.) Medical records show he had outside orthopedic medical care on the 3rd and that in his cell he received Tylenol, ibuprofen, and an ice pack. (Ex. 16 (0006).) On the 6th, the plaintiff had court and was gone most of the day. By December 7, his medical records show that the eye ointment was "okay to discontinue" because "pt. denies any problems with his eye."[13] (*Id.* (0011-0012); Ex. 19.) Based on the foregoing, the plaintiff may not have received his eye ointment on only one occasion. Jail logs show nurses visited the HW unit daily. (Ex. 19.)

The plaintiff claims that he did not ask the nurses to point the ointment in his eye when they came to his cell because "it wasn't time[;] [i]t was supposed to be every 6-hour period." (Burton Dep. at p. 127.) The plaintiff has not named liability or medical experts. The sole basis for the plaintiff's medical care claim is his own beliefs, unsupported by evidence from a competent physician or the medical records themselves, that he was not provided appropriate medical care.

---

[12] The plaintiff states: "Jail records show that on 12-4-04 Saturday 1st shift at "LE 0700" is when Burton got eye medicine; which would come 23 hours after the first and only time a nurse put eye medicine in Burton's eye. The record will show that it was over 24 hours later at 0720 on 1st shift 12-5-04 Sunday and not again until 52 hours later 12-7-04 1st shift at 1112 that Burton received eye medication he was to get at least every 6 hours. The record will show the only time Burton got eye medicine within the 6 hour time was on 12-7-04 2nd shift at 1755." (Pl.'s Resp. at 8.)

[13] The plaintiff states: "Jail records and medical records will show that Mr. Burton did not go to the orthopedics on December 3rd 2004, but, at a later date of December 8, 2004 at 0655. (Pl.'s Resp. at 8.) The plaintiff also states: "There is nothing in the medical records to show nor quotes Burton as denying any problems with his eye." (*Id.* at 9.)
According to the defendants, the plaintiff does not dispute this proposed fact, "except for what appears to be his own misinterpretation of his Kenosha County Detention Center medical records." (Defs.' Reply to Pl.'s Resp. at 13 ¶ 101.) "Five days after the incident, his medical record contain the medical provider's hand-written notations to discontinue the eye ointment: "okay to d/c Gentamycin opth ointment" (see Exhibit 16 attached to Affidavit of Bitar at bate numbered page 0011) and "denies any problems with his eye" (see Exhibit 16 attached to Affidavit of Bitar at bate numbered page 0012)." (*Id.*)

21

## ANALYSIS

The defendants contend that, 1) the plaintiff's excessive force claim fails as a matter of law because he cannot establish that correctional officers applied force maliciously or sadistically to cause harm; 2) the plaintiff's conditions of confinement and medical care claim should be dismissed because he has failed to exhaust his administrative remedies; 3) the plaintiff cannot establish that the defendants violated his Fourteenth Amendment constitutional right with respect to his conditions of confinement; 4) the plaintiff's claim of inadequate medical care fails as a matter of law because he cannot establish that a municipal actor acted with deliberate indifference to a serious medical need and that such indifference caused an injury in fact; 5) qualified immunity bars the individual capacity claims; and 6) claims against Unknown Officers must be dismissed for failure to develop.

### 1. Excessive Force Claim

Because the plaintiff was a pretrial detainee, his excessive force claim must be assessed within the context of the Due Process Clause. *See Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir. 2000). However, the Fourteenth Amendment standard governing excessive force claims in the prison security context is the same as the Eighth Amendment standard. *Wilson v. Williams*, 83 F.3d 870, 876-77 (7th Cir. 1996). Therefore, the court will analyze this claim under the Eighth Amendment.

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. Factors in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat

22

'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" using force at the risk of injury to inmates. *Hudson*, 503 U.S. at 6. Both situations require officials to act quickly and decisively. *Id.* Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal citations and quotations omitted.)

It is undisputed that the plaintiff was a high-security inmate, who presented an assault and escape risk and who had prior insubordination problems, and who had a size and height advantage over the jail officers. It is also undisputed that the plaintiff instigated the December 2, 2004, incident by his insubordination and recalcitrance towards the defendants. The defendants applied force in order to maintain and restore discipline. The defendants receive appropriate and continuing instruction in the use of force, and they have never previously been charged or accused of excessive force. The use of the OC spray comported with the policies and procedures of the jail policy and the officer's training. In addition, medical care and attention were immediately provided to the plaintiff.

The Seventh Circuit Court of Appeals has stated:

"When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While . . . it was suggested that rather than seek to enforce order, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

23

> Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline."

*Colon v. Schneider*, 899 F.2d 660, 668-69 (7th Cir. 1990) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984)).

The plaintiff's conclusory averments that he was "grabbed for no reason" and that injuries were inflicted upon him on purpose and in bad faith are not supported by admissible evidence. "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)). Based on the foregoing, the court finds that no reasonable jury could find that the defendants used excessive force in violation of the Fourteenth Amendment. Therefore, the defendants' motion for summary judgment as to the plaintiff's excessive force claim will be granted.

**2. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535

24

(7th Cir. 1999)).  Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines.  *Woodford v. Ngo*, 126 S.Ct. 2378, 2384, 2387 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require").  Exhaustion is an affirmative defense, and the burden of proof is on the defendants.  *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

The defendants contend that the plaintiff's conditions of confinement and medical care claims must be dismissed for failure to exhaust administrative remedies.  The plaintiff contends that he was unable to exhaust these claims because he did not have access to writing materials while in segregation.

However, the plaintiff does not dispute that he completed several written request forms and other grievances between December 2004 and January 2005.  He also does not dispute that forms were available upon request for filing his grievance.  In addition, in his complaint the plaintiff alleges that he wrote "three inmate request forms asking for Wisconsin's law books and six grievance forms."  (Compl. ¶ I.)

If prison officials fail to provide grievance forms to inmates, then administrative remedies are not "available."  *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004).  However, in this case it is undisputed that the plaintiff filed six inmate grievances during the time period in which he avers that

Case 2:05-cv-00367-WEC   Filed 03/08/07   Page 25 of 27   Document 72

he did not have access to writing materials. Moreover, the plaintiff does not allege that he filed an inmate grievance related to these claims once writing materials became available to him. Under these circumstances, the court finds that the plaintiff has failed to exhaust administrative remedies with respect to his conditions of confinement and medical care claims. Therefore, the defendants' motion for summary judgment will be granted.

## PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

The plaintiff has filed a motion to amend the complaint to identify the Unknown Officer defendants. Rule 15(a) of the Federal Rules of Civil Procedure states that leave to file an amended complaint "shall be freely given when justice so requires." The Supreme Court has explained the meaning of "freely given" as used in Rule 15(a) by stating:

> In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of a movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. - the leave sought should, as the rules require be freely given.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

In this case, the plaintiff has not filed the requisite proposed amended pleading along with his motion. *See* Civil L.R. 15.1 (E.D. Wis.). In any event, identifying the previously unknown officers who were allegedly involved in the plaintiff's excessive force claim would be futile in light of the court's decision in this case. Moreover, the delay in filing the amended complaint would unduly prejudice the defendants. Accordingly, the plaintiff's motion will be denied.

## ORDER

**IT IS THEREFORE ORDERED** that the's defendants' motion for summary judgment (Docket # 47) be and hereby is **GRANTED**;

26

**IT IS FURTHER ORDERED** that the plaintiff's motion to amend/correct complaint (Docket #68) be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

**SO ORDERED** this <u>8th</u> day of March 2007, at Milwaukee, Wisconsin.



<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge